[No. B229482. Second Dist., Div. Eight. Jan. 30, 2013.]

In re the Marriage of RICHARD TURKANIS and JOAN M. PRICE.
RICHARD TURKANIS, Respondent, v.
JOAN M. PRICE, Appellant;
BRIAN J. KRAMER, Appellant.

[No. B234011. Second Dist., Div. Eight. Jan. 30, 2013.]

In re the Marriage of RICHARD TURKANIS and JOAN M. PRICE.
RICHARD TURKANIS, Respondent, v.
JOAN M. PRICE, Appellant;
DANIEL B. SPITZER, Appellant.

334

COUNSEL

Brian J. Kramer, in pro. per., for Appellant Brian J. Kramer and for Appellant Joan M. Price.

Daniel B. Spitzer, in pro. per., for Appellant Daniel B. Spitzer.

Buter, Buzard, Fishbein & Royce and Glenn S. Buzard for Respondent.

OPINION

**FLIER, J.**—This is the third appeal we consider in this marital dissolution action between Richard Turkanis and Joan M. Price. In the first appeal, we considered the trial court's order after the first of two phases of trial. The purpose of the first phase of trial was to set the value at the date of marriage of a closely held corporation (Radman) formed by Turkanis prior to marriage (the valuation trial). We permitted Price an interlocutory appeal from the valuation order and affirmed it in a nonpublished opinion. (*In re Marriage of Price & Turkanis* (May 11, 2011, B218753).) Price brought the second appeal

after the second phase of trial in which the trial court allocated assets between Price and Turkanis (the allocation trial). We affirmed the trial court's judgment after the allocation trial in a nonpublished opinion. (*In re Marriage of Price & Turkanis* (July 19, 2012, B226221).)

In this third proceeding, former attorneys for Price, Brian J. Kramer and Daniel B. Spitzer, appeal from the trial court's order granting Turkanis's motion to expunge the attorneys' "family law attorney's real property liens" (FLARPL's). (See Fam. Code, § 2033, subd. (a).)[1] Kramer and Spitzer recorded these FLARPL's to secure their fees and costs when they represented Price during the first phase of trial. They contend that the court erred in granting Turkanis's motion to expunge their FLARPL's because (1) the relevant sections of the Family Code do not permit the court to expunge duly noticed and recorded FLARPL's, (2) the trial court should have joined them to the action before entering a judgment stripping their FLARPL's, and (3) the court should have granted Kramer's request for a statement of decision on the motion to expunge the FLARPL's.

Kramer and Price also appeal from the court's order on Kramer's *Borson*[2] motion for attorney fees, in which the court ordered Turkanis to pay $39,000 to Kramer for Price's fees. They contend that the court erred in offsetting the fee award for unreasonable litigation conduct under section 271. We affirm both orders.

## FACTUAL AND PROCEDURAL BACKGROUND

Turkanis and Price married on March 31, 1995. They have one child, a daughter, born in 1997. They separated on December 19, 2003. Turkanis filed this dissolution action on February 10, 2004. The court entered a status-only judgment of dissolution on November 10, 2005.

The first phase of trial, the valuation trial, commenced on May 19, 2008. The valuation trial took place on various days in May and June of 2008 and January, February, March, June, and July of 2009. On August 3, 2009, the court issued its 25-page written ruling valuing Radman as of the date of marriage.

The second phase of trial, the allocation trial, commenced on February 10, 2010, and continued on three more days that month. The court entered its amended judgment dividing the parties' assets on June 1, 2010. The parties' daughter was in Turkanis's custody at the time of the court's judgment but

---

[1] All further statutory references are to the Family Code unless stated otherwise.

[2] *In re Marriage of Borson* (1974) 37 Cal.App.3d 632 [112 Cal.Rptr. 432] (*Borson*).

was under the jurisdiction of the dependency court, so the trial court did not make any orders regarding child custody or visitation. At the allocation trial, Turkanis demonstrated that Price had received postseparation distributions in excess of $1.1 million during the pendency of the litigation. Turkanis himself had received approximately the same amount in distributions.

### 1. *Kramer's FLARPL*

Spitzer and Kramer associated in as Price's counsel during the pendency of the valuation trial, Spitzer in July 2008 and Kramer in December 2008. They were the 10th and 11th attorneys to enter appearances for Price. Price did not have funds available to pay Kramer's retainer fee. Thus, as part of her retainer agreement with Kramer, she agreed that Kramer's firm could seek to record a FLARPL pursuant to section 2033 against one of the two single-family residences the parties owned. She agreed the FLARPL would cover the retainer fee plus any unpaid fees and costs due at the time Kramer recorded the FLARPL.

Pursuant to section 2033, subdivision (b), on February 13, 2009, Price served and filed a notice of intent to record Kramer's FLARPL in the amount of $140,000. Her supporting declaration stated that she and Turkanis owned two single-family residences in Los Angeles, one at 1234 N. Bundy Drive (1234 Bundy) and one at 1250 N. Bundy Drive (1250 Bundy). The notice said she intended to permit Kramer to record a FLARPL against 1234 Bundy, which had a fair market value, she believed, of over $1 million. Approximately one month prior, Turkanis had filed an income and expense declaration opining that the 1234 Bundy property had $1.75 million in equity value.

On February 26, 2009, Turkanis filed an ex parte application and objection to Price's notice of intent. In it, he stated that he had no objection to Kramer recording a FLARPL against the 1234 Bundy property. Under the section for requested relief, he specifically stated: "That [Price's] counsel be allowed a FLARPL on 1234 Bundy Avenue [*sic*] in the sum of $140,000." But he objected to a FLARPL against the 1250 Bundy property. He believed the equity value of the 1250 Bundy property to be $2.6 to $2.9 million. He also believed the court should eventually award him all the proceeds from the sale of the 1250 Bundy residence as his separate property, given the value of Radman when he brought it to the marriage. Under these circumstances, he felt it would be prejudicial to his claims and unjust to permit Kramer to record a FLARPL against 1250 Bundy. As to 1234 Bundy, he stated: "[Price] has advised the Court of her desire to ultimately own the 1234 Bundy Avenue [*sic*] Property. If my valuation of Radman ultimately prevails, it is unlikely that [Price] could be awarded the 1234 Bundy Avenue [*sic*] property without owing me substantial funds. However, if she were able to secure these funds

and she was awarded the 1234 Bundy Avenue [*sic*] Property as she has indicated is her desire, then I believe it is appropriate that the [FLARPL] to secure [Price's] payment of her attorneys' fees be recorded against the property awarded to her."

Price filed an amended notice of intent regarding Kramer's FLARPL on or around April 2, 2009. She indicated in the notice that the court held a hearing on February 26, 2009, at which it had authorized Kramer to file a FLARPL against 1234 Bundy but denied without prejudice her request for a FLARPL against 1250 Bundy. The court had suggested that if Price wanted a FLARPL against 1250 Bundy, she needed to file a new notice because the initial one had identified only 1234 Bundy as the property against which she wanted a $140,000 FLARPL. Thus, she was filing the amended notice because she preferred the $140,000 FLARPL to be against 1250 Bundy.

Turkanis filed an ex parte application and objection to the amended notice on or around April 17, 2009. He objected to the recording of a FLARPL against 1250 Bundy but again stated he had no objection to a FLARPL for $140,000 against Price's interest in 1234 Bundy. Under the section for requested relief, he specifically stated: "[Price] may record a FLARPL against [her] interest in 1234 Bundy Avenue [*sic*] in the sum of $140,000. Said lien shall not apply or be assigned to any rents, issues, or profits that may be generated at any time prior to the Court's determination of [her] interest in the property." He stated the same objections to a FLARPL against 1250 Bundy as he had previously stated, and also restated verbatim his view that 1234 Bundy could not be awarded to Price in the ultimate division of property without her owing him substantial funds.

Price filed a response to the objection arguing that, given the undisputed equity in both Bundy properties, there was no basis for Turkanis to assert that a FLARPL against one property over the other would result in an unequal division of property or otherwise be unjust. She believed that she had sizeable separate property claims of her own. She further believed that, even under a worst case scenario, she should receive several hundred thousand dollars of equity in the two homes. She and Kramer were optimistic that the outcome of trial would enable her to continue living at 1234 Bundy and therefore they preferred the FLARPL to be against 1250 Bundy.

After the hearing on Turkanis's ex parte application and objection, Kramer was permitted to record a FLARPL against Price's community property interest in 1234 Bundy but not 1250 Bundy. Price executed the deed of trust that effectuated the FLARPL for $140,000 on May 26, 2009. The deed was recorded on June 2, 2009. The property at 1234 Bundy was otherwise unencumbered.

Kramer filed a substitution of attorney substituting out as counsel for Price on or around December 9, 2009, after the valuation trial but before the allocation trial commenced. Price was thereafter representing herself, except that Kramer made a few more appearances to represent Price on a limited basis regarding a trial continuance. Between December 2008 and February 2010, Price incurred approximately $273,109 in fees and costs for Kramer's services.

### 2. Spitzer's FLARPL

On or about June 26, 2009, Price filed and served a notice of intent to permit Spitzer to record a FLARPL against 1234 Bundy. She stated that the FLARPL was to be for $125,000, and at that point she had already incurred approximately $94,000 in fees for Spitzer's services. She believed that the property had over $1 million in equity value, and there were no encumbrances on it other than Kramer's FLARPL. Turkanis intended to file an objection to the notice, but instead the parties agreed to work on a deed of trust effectuating the FLARPL that was agreeable to both of them. They eventually agreed on the form of the deed of trust, which would effectuate a FLARPL for $150,000 against Price's community property interest in 1234 Bundy. Spitzer recorded the deed of trust effectuating the FLARPL on September 28, 2009.

Spitzer filed a substitution of counsel substituting out as Price's counsel on or about November 20, 2009.

### 3. Judgment After Valuation and Allocation Trials

The court's judgment divided the assets between Price and Turkanis. It found Turkanis's corporation, Radman, to have a value of $6,252,000 at the date of marriage. Turkanis sold Radman in 1998, after the parties had married. The court determined that his separate property interest in the proceeds from the sale of Radman was $6,283,988. At the allocation trial, the separate property proceeds were traced, and the court awarded assets accordingly. From the community estate, the court awarded Turkanis both the 1234 Bundy property and the 1250 Bundy property, among other things. After the tracing of the Radman sale proceeds, the division of presumptive community assets, the confirmation of separate property, and the determination of reimbursements and credits owing, the court determined that Price owed Turkanis an equalization payment of $154,289.

The court found the 1250 Bundy property had equity of $2 million. The judgment stated that the 1234 Bundy property had equity of $1.5 million and was "encumbered only by a lien for delinquent real property taxes"—despite

that Kramer and Spitzer had recorded FLARPL's for $140,000 and $150,000, respectively, against the property. Still, it is clear from the transcript of the court's rendering of its proposed statement of decision that the court and Turkanis were aware of the FLARPL's and did not consider them expunged by the judgment. Turkanis indicated that he did not address the FLARPL's in the proposed judgment, which he drafted, because he "did not think it was appropriate" to extinguish the FLARPL's without giving Kramer and Spitzer a chance to be heard. He suggested that he file a motion to extinguish the FLARPL's, and the court agreed. The court ordered Turkanis to give notice to "the FLARPL holders" and Price.

### 4. Turkanis's Motion to Expunge the FLARPL's

On or about March 18, 2010, Turkanis served notice on Price, Kramer, and Spitzer that the court would hear Turkanis's motion to expunge the FLARPL's on June 1. He also gave notice that the court would hear Kramer's earlier filed *Borson* motion for fees on the same date.

Turkanis filed his "motion to deny enforcement of, and to extinguish, expunge, and/or limit real property liens" on or about May 4, 2010. For the most part, he argued that the FLARPL's were unjust under the circumstances. These circumstances included the following: (1) as a result of Radman's value at the date of marriage, Turkanis had substantial separate property claims; (2) since the attorneys had recorded the FLARPL's, the Bundy properties had diminished in value;[3] and (3) the court had made two fee awards to Price since the FLARPL's, one for $21,000 and one for $79,000. Turkanis asserted that rendering his separate property (1234 Bundy) liable for payment of Price's attorney fees was an inequitable division of property.

Kramer opposed the motion to expunge on the ground that Turkanis had consented to the FLARPL on 1234 Bundy, the FLARPL was an integral condition of Kramer's agreement with Price, Kramer had acted in reliance on the FLARPL in representing Price, and there was no basis in law or equity for now expunging it. Spitzer similarly argued that Turkanis had consented to his FLARPL against 1234 Bundy and had agreed to the form of the trust deed with Spitzer, and Spitzer had relied on the FLARPL in agreeing to represent Price. Kramer requested that the court issue a statement of decision when it ruled on the motion to expunge and his *Borson* motion.

---

[3] Turkanis asserted that the equity in 1250 Bundy had decreased by at least $750,000 and the equity in 1234 Bundy by $250,000, for a total loss of at least $1 million. He noted that this amount would have been sufficient to cover both the $154,289 equalization payment Price owed him and the FLARPL's. But this equity had evaporated, he argued, by the time of the judgment.

At the hearing on the motion to expunge, the trial court noted that the statutory requirements for recording the FLARPL's were followed. But the court stated that when attorneys take FLARPL's against the community interest, they take them subject to the risk that the market or the facts of the case "may eat up their client's interest in the property." The court granted the motion to expunge the FLARPL's.

Turkanis prepared a proposed order much later, and approximately nine months after the hearing, the court entered the order granting the motion to expunge. The court held that section 2034 expressly granted it the authority to deal with a FLARPL at any time, and subdivision (a) of that section permitted it to deny a FLARPL based on a finding that it would result in an unequal division of property. The court found that, during trial, 1234 Bundy had declined in value, and Price had received substantial distributions of cash during trial. It noted that it awarded the entirety of 1234 Bundy to Turkanis, and there was currently an unpaid equalization payment due from Price to Turkanis. The court stated that ordering Turkanis to pay Kramer's and Spitzer's FLARPL's, and then adding that amount to the equalization payment, was not a fair reading of the Family Code. It found that "the Family Code, including sections 2030, 2031, 2032, 2033, and 2034, must be read in its entirety with regard to attorneys fees, and that sections 2033 and 2034, regarding [FLARPL's], are not a fee-shifting mechanism." The court's order extinguished and expunged Kramer's and Spitzer's FLARPL's. The court denied Kramer's request for a statement of decision.

Kramer filed a motion to reconsider the order granting the motion to expunge the FLARPL's. He based his motion on "new facts and circumstances" set forth in the declaration of a real estate appraiser, who opined that there was no merit to Turkanis's position that the Bundy properties had lost $1 million in equity during the relevant time period. Kramer requested a statement of decision on the motion for reconsideration. The court denied the motion, in part because Kramer did not show that the "new" information could not have been presented at the time of the original motion. The court did not issue a statement of decision.

Spitzer and Kramer thereafter filed timely notices of appeal. Turkanis apparently desired to sell the Bundy properties after the court expunged the FLARPL's. The parties entered into a stipulation that, upon the sale of 1234 Bundy, Turkanis would transfer $290,000 of the sale proceeds into an interest-bearing account, representing Kramer's FLARPL for $140,000 and Spitzer's FLARPL for $150,000. No withdrawals would be permitted from the account until either a court order so directed, the remittitur issued in this appeal, or the parties settled the appeal.

## 5. *Kramer's* Borson *Motion*

Kramer filed a *Borson* motion for fees on or about November 5, 2009. In *Borson*, the court held that attorneys who have been discharged while an action is pending may, with the former client's consent, file a motion for their attorney fees. (*Borson, supra,* 37 Cal.App.3d at p. 637.) On behalf of Price, Kramer was seeking fees from Turkanis in the amount of $237,046. This amount included the $140,000 for which Kramer had the FLARPL. The court held a hearing on December 8, 2009, at which it continued Kramer's *Borson* motion to a later date, either at the allocation trial or subsequent to trial when all other *Borson* motions would be heard. Later, when the continued hearing had been noticed for a date certain, Kramer filed additional papers establishing that the updated amount of fees he was seeking was $273,109. Turkanis's response to the *Borson* motion argued in part that Price's fee requests were not limited to fees that were "reasonably necessary" or "just" in light of her conduct that had needlessly prolonged litigation and her failure to engage in good faith settlement negotiations. Turkanis asserted that this conduct was also justification for sanctions under section 271, and such sanctions should offset any fee award.

The court heard argument on the *Borson* motion in August 2010 and filed a 14-page written order on October 26, 2010. It ordered Turkanis to pay Kramer $39,000 in fees. The court's order thoroughly summarized the previous awards of attorney fees to Price, the work performed by Kramer, and the respective financial situations of the parties. The court had previously awarded Price $21,000 in April 2009, and another $79,000 in December 2009, plus $25,000 for costs. Thus, she had received approximately $125,000 total for fees and costs. Price chose to use the December award for her appellate counsel to pursue the interlocutory appeal from the valuation order, rather than pay Kramer.

In terms of the parties' financial situations, the court found Turkanis had $5,704 net monthly income, his new spouse had no income in 2010, and he had monthly household expenses of $14,230 for the support of himself, his spouse, the parties' daughter, and his spouse's two children. He had debts in an amount over $1.1 million, excluding the debt on 1250 Bundy, but including $525,340 he owed his counsel. He had already paid $212,289 in fees so that his total fee obligation at that point amounted to $737,629. Price owed him an equalization payment as detailed in the judgment, but there was no obvious source of payment. He had $9,400 in cash, $24,750 in securities, $290,552 in a mutual fund, and retirement accounts valued at $232,000. He had been awarded the Bundy properties, which had $3.5 million net equity as estimated in the judgment. He had 100 percent custody of the parties' daughter and did not receive child support.

Price was not working and had no income, although she was a member of the California bar and a licensed real estate broker. She had expenses of $5,508 per month. Her income and expense declaration in support of the *Borson* motion did not quantify her assets, but stated they are not sufficient to comply with a previous court ruling, which ordered her to repay $60,000 she had withdrawn without authorization from a line of credit and a Schwab account. She had $40,000 in credit card debt, and including the equalization payment and the $60,000 the court had ordered her to repay, she owed Turkanis approximately $212,000. She had paid her various prior counsel $415,000 in fees. She owed an additional $677,730 in attorney fees. (Besides Kramer, several other former attorneys had filed *Borson* motions. This $677,730 was the total due Kramer and the others.) Her total fee obligation at that point was thus $1,092,730.

The court held that Turkanis could assert as a defense that Price's litigation conduct justified an offset against any fee awards under section 271. It further held that her conduct supported an offset under section 271. In particular, she failed to comply with court orders regarding the management of the Bundy properties, giving rise to considerable fees when Turkanis was forced to seek court orders to take over management of the properties, to arrange for payment of their expenses after Price allowed property taxes to go unpaid and the mortgage on 1250 Bundy to go into default, and to obtain funds to repair the properties after Price vacated them and left them in a condition that was not rental ready. After reviewing Kramer's bills, the court determined that approximately $33,000 of his fees dealt with issues surrounding the Bundy property's management. The court also considered Price's approach to settlement and found it so unreasonable that it rendered settlement negotiations futile.

The court held that, based on the parties' respective income and expense declarations, Turkanis had the ability to contribute to Price's fees as well as pay his own. It noted that it was considering the reasonableness of the fees incurred, the prior fee awards to Price, the procedural posture of the case (the fact that Price owed Turkanis an equalization payment and she had appealed the order giving rise to that payment), and Price's apparent inability to make the equalization payment. The court then stated as follows: "By subtracting from the total fees incurred by Dr. Turkanis only the amount of Ms. Price's fees for dealing with management of the real property and assuming nothing else changed, Dr. Turkanis' total fees would have been approximately $700,000. Ms. Price's total reasonable fees should have been approximately the same. Total fees by both sides would have been approximately $1,400,000. While settlement was not required, it bears noting that had the case settled after the first valuation hearing, when Dr. Turkanis' fees were approximately $530,000, and again subtracting only the fees incurred due to [the] hearing on management of the Bundy property, the combined total of both parties'

reasonable fees and costs would have been $1 million or less. Instead, the total fees and costs now exceed $1.8 million, with Dr. Turkanis being responsible for $861,000 thereof, to date, and without considering his appellate fees, or his uncollected equalizing payment."

The court ordered Turkanis to pay Kramer $39,000 as a contribution to Price's fees, "[c]onsidering all the circumstances, including the parties' respective financial positions, the fact that Ms. Price is obligated under the judgment to pay an equalizing payment to Dr. Turkanis that is not likely to be collected, Dr. Turkanis' need to pay his own counsel and experts both for trial and for the pending appeal, the fact that Dr. Turkanis is the sole support for [the parties' daughter], and given Ms. Price's litigation conduct." The court noted that, with this award, Turkanis's contributions to Price's fees came to $164,000, and he incurred total fees for himself and Price slightly in excess of $900,000. Kramer, identifying himself as former attorney for Price, timely filed a notice of appeal from the *Borson* order in which he identified Price as appellant. The opening brief identifies "Kramer and Price" as the appellants from the *Borson* order.

## STANDARD OF REVIEW

We review the trial court's order granting the motion to expunge the FLARPL's for abuse of discretion. (*Biddle v. Superior Court* (1985) 170 Cal.App.3d 135, 136 [215 Cal.Rptr. 848] [reviewing order on motion to expunge lis pendens for abuse of discretion].) However, we review the trial court's factual findings supporting its order for substantial evidence (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 461 [17 Cal.Rptr.3d 96]), and we review the court's interpretation and construction of the relevant Family Code sections de novo (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956]).

We review an award of attorney fees under the Family Code for abuse of discretion, "and we therefore must affirm unless no judge reasonably could make the order." (*In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 829 [130 Cal.Rptr.2d 1].) Likewise, we review for abuse of discretion a court's choice not to issue a statement of decision on a motion. (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1497 [64 Cal.Rptr.3d 29].)

## DISCUSSION

1. *The Trial Court Did Not Err in Expunging the FLARPL's*

Turkanis contends that the court did not err in expunging the FLARPL's because Price had no remaining interest in 1234 Bundy to which the

FLARPL's could attach after the court awarded the property to him, and additionally, the relevant Family Code statute permitted the court to expunge the FLARPL's at any time upon application of either party. We disagree with the first contention, but agree with the latter.

a. *Background of Sections 2033 and 2034*

Family Code sections 2033 and 2034 provide for FLARPL's and permit the court to deny FLARPL's under certain circumstances. These sections were originally enacted as former sections 4372 and 4373 of the Civil Code. (*Lezine v. Security Pacific Fin. Services, Inc.* (1996) 14 Cal.4th 56, 68, fn. 7 [58 Cal.Rptr.2d 76, 925 P.2d 1002] (*Lezine*).) Effective January 1, 1994, Civil Code former sections 4372 and 4373 were repealed and replaced without substantive change by Family Code sections 2033 and 2034. (*Lezine*, at p. 68, fn. 7.)

The Legislature enacted Civil Code former sections 4372 and 4373 in response to the California Supreme Court's opinion in *Droeger v. Friedman, Sloan & Ross* (1991) 54 Cal.3d 26 [283 Cal.Rptr. 584, 812 P.2d 931] (*Droeger*). (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3399 (1991–1992 Reg. Sess.) June 16, 1992, pp. 2–3; *Lezine, supra*, 14 Cal.4th at p. 68, fn. 7.) In *Droeger*, a marital dissolution action, the wife executed a deed of trust on two parcels of community real property to secure a note in favor of her attorneys for their fees and costs. (*Droeger, supra*, at p. 30.) The husband did not join in her execution of the note or deed of trust. (*Ibid.*) The court held that the husband was entitled to void the encumbrance on the community real property in its entirety, and he was not limited to voiding the encumbrance only with respect to his one-half community interest. (*Id.* at p. 40.) The holding was based on former section 5127 of the Civil Code.[4] (*Droeger*, at p. 31.) That section stated in pertinent part: " '[E]ither spouse has the management and control of the community real property . . . , but both spouses either personally or by duly authorized agent, must join in executing any instrument by which such community real property or any interest therein is leased for a longer period than one year, or is sold, conveyed, or encumbered . . . .' " (*Ibid.*) The court reasoned that nothing in Civil Code former section 5127 permitted an exception to the general rule against unilateral transfers by one spouse of community realty. (*Droeger*, at p. 41.) It explained that any such exception would contravene the fundamental principles of equal management and shared responsibility over community property and the premise that neither spouse alone may partition community property during marriage. (*Id.* at pp. 46–47.) The court noted: "If [Civil Code

---

[4] Effective January 1, 1994, former section 5127 of the Civil Code was continued in Family Code section 1102 without substantive change. (Cal. Law Revision Com. com., Deering's Ann. Fam. Code (2006 ed.) foll. § 1102, p. 387.)

former] section 5127 is to be amended to create an exception allowing a spouse to unilaterally transfer community realty to secure attorney fees in a dissolution proceeding, it is the task of the Legislature and not the courts to create that exception." (*Id.* at p. 41.)

The Legislature took heed. Comment on the proposed FLARPL bill in the Senate Judiciary Committee noted that the author believed the bill was necessary to abrogate the *Droeger* holding, and the bill would do so by permitting a spouse to encumber his or her interest in community real property to pay attorney fees and costs in a dissolution action. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3399 (1991–1992 Reg. Sess.) June 16, 1992, p. 2.) The comments further explained: "The author notes that the community real property may be the only asset a party has, particularly the weaker spouse. The author states that this bill would allow that spouse to retain legal counsel when he or she otherwise would be unable to afford it." (*Ibid.*)

Section 2033 thus provides for FLARPL's as follows: "Either party may encumber his or her interest in community real property to pay reasonable attorney's fees in order to retain or maintain legal counsel in a proceeding for dissolution of marriage, for nullity of marriage, or for legal separation of the parties. This encumbrance shall be known as a '[FLARPL]' and attaches only to the encumbering party's interest in the community real property."[5] (§ 2033, subd. (a).) The encumbering spouse must serve notice of the FLARPL on the nonencumbering spouse at least 15 days before recording the FLARPL. (§ 2033, subd. (b).) Such notice must include a declaration containing (1) a full description of the community real property, (2) the encumbering spouse's belief as to the fair market value of the property and supporting documentation, (3) any other encumbrances on the property, (4) a list of community assets and liabilities and their estimated values, and (5) the amount of the FLARPL. (§ 2033, subd. (b)(1)–(5).)

The nonencumbering spouse may file an "ex parte objection" to the FLARPL. The objection must request to stay the recordation of the FLARPL until further notice of the court and should also include a declaration containing (1) specific objections to the FLARPL and to specific items in the notice, (2) the nonencumbering spouse's belief as to the appropriate items or value and any supporting documentation, and (3) specific reasons why recordation of the FLARPL "would likely result in an unequal division of property or would otherwise be unjust under the circumstances of the case." (§ 2033, subd. (c)(1)–(3).)

---

[5] Family Code section 1102, the successor to Civil Code former section 5127, still mandates that both spouses must join in encumbering community real property, but it carves out an exception for FLARPL's. (§ 1102, subd. (e) ["Nothing in this section precludes either spouse from encumbering his or her interest in community real property, as provided in Section 2033 . . . ."].)

■ Section 2034 deals with the circumstances under which the court may deny a FLARPL and provides in pertinent part: "On application of either party, the court may deny the [FLARPL] described in Section 2033 based on a finding that the encumbrance would likely result in an unequal division of property because it would impair the encumbering party's ability to meet his or her fair share of the community obligations or would otherwise be unjust under the circumstances of the case. The court may also for good cause limit the amount of the [FLARPL]. A limitation by the court is not to be construed as a determination of reasonable attorney's fees." (§ 2034, subd. (a).) Section 2034 also provides that the court may, upon receiving an objection to the FLARPL, determine whether the case involves complex or substantial issues of fact or law, and if it does, the court may implement a case management plan to oversee an appropriate allocation of fees and costs in the matter. (§§ 2034, subd. (b), 2032, subd. (d).) Additionally, section 2034 establishes that the "court has jurisdiction to resolve any dispute arising from the existence of a [FLARPL]." (§ 2034, subd. (c).)

The reported case law interpreting or applying sections 2033 and 2034, or their predecessor sections, is scant. Only one reported California case exists interpreting or applying these sections in any measure, *In re Marriage of Ramirez* (2011) 198 Cal.App.4th 336 [132 Cal.Rptr.3d 41] (*Ramirez*), which we discuss more in a following part. But *Ramirez* does not directly address all the issues before us. We are, therefore, guided in large part by the plain language of the statute and analogous case law.

b. *The Court's Division of Property Did Not Automatically Extinguish the FLARPL's*

■ To begin with, insofar as Turkanis contends he should prevail because the judgment extinguished Price's community property interest in 1234 Bundy by awarding the property to Turkanis, and the FLARPL's therefore had nothing to which they could attach after that, this is incorrect. The court's division after trial of community or quasi-community property does not ordinarily affect the enforceability of valid, preexisting liens on the property. Section 916, regarding the division of property and subsequent liabilities, states in pertinent part: "The separate property owned by a married person at the time of the division and the property received by the person in the division is not liable for a debt incurred by the person's spouse before or during marriage, and the person is not personally liable for the debt, unless the debt was assigned for payment by the person in the division of the property. *Nothing in this paragraph affects the liability of property for the satisfaction of a lien on the property.*" (§ 916, subd. (a)(2), italics added.)
■ Thus, as our Supreme Court has held, "[u]nder this provision, following the division of property, the community property awarded to one spouse no

longer is liable for marital debts that are assigned to the other spouse, *with the exception that* the award of community real property to one spouse that is subject to a lien remains liable for satisfaction of the lien, i.e., the lien remains enforceable to satisfy the underlying debt." (*Lezine, supra,* 14 Cal.4th at p. 65, italics added; see *Ramirez, supra,* 198 Cal.App.4th at pp. 343–344 [citing *Lezine* for the proposition that a valid lien attached to community property follows the property even after the court awards it to the nonencumbering spouse in property division].) The nondebtor spouse is not without remedies, however. If a lien is enforced against property that has been awarded to the nondebtor spouse, the nondebtor spouse has a right of reimbursement from the debtor spouse. (*Lezine,* at p. 65.)

Our Supreme Court applied these rules in *Lezine.* There, the husband incurred a debt, and the creditor perfected a judgment lien for the debt before the court divided the community property in the husband and wife's dissolution action. (*Lezine, supra,* 14 Cal.4th at pp. 61–62.) Among the community property was the couple's residence. The trial court eventually awarded the couple's residence to the wife as her sole and separate property and assigned the husband's debt to him. (*Id.* at p. 62.) Still, the court held the transfer of the residence to the wife in the property division, after the judgment lien had attached, "did not alter the liability of the property to satisfy the lien or otherwise affect the judgment lien. . . . [T]he allocation of community real property to the nondebtor spouse in the property division does not affect the enforceability of any liens that previously attached to that real property, even if the underlying debt is assigned exclusively to the debtor spouse. . . . [T]he nondebtor spouse may seek reimbursement against the debtor spouse to the extent the property is applied in satisfaction of the liens." (*Id.* at pp. 73–74, citations omitted.) Accordingly, the court held that the trial court lacked authority to expunge the creditor's judgment lien after the court had awarded the residence to the wife as her separate property. (*Id.* at p. 74; see *Kinney v. Vallentyne* (1975) 15 Cal.3d 475, 477, 479 [124 Cal.Rptr. 897, 541 P.2d 537] [judgment lien against husband that attached after interlocutory decree of divorce but before community property division still attached to community realty even after court awarded realty to wife as her separate property].)

The lien, once validly attached to the property, follows the property pursuant to section 916 and does not automatically disappear because the court awards the property to the nonencumbering spouse. Here, there does not seem to be any dispute that, at the time the FLARPL's were created, 1234 Bundy was presumptive community property. (§ 760 ["Except as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property."]; *In re Marriage of Mix* (1975) 14 Cal.3d 604, 610–611 [122 Cal.Rptr. 79, 536 P.2d 479] [" '[Property] acquired by purchase during a marriage is presumed to be community property, and the burden is on the

spouse asserting its separate character to overcome the presumption.' "].) There also does not seem to be any dispute that Price and her attorneys complied with the statutory requirements of section 2033 for attaching the FLARPL's. They gave notice to Turkanis, he consented to the FLARPL's against Price's one-half community interest in 1234 Bundy, and the attorneys duly recorded the deeds of trust. The court's award of 1234 Bundy to Turkanis as his separate property did not *automatically* extinguish the liens.

c. *Section 2034 Permitted the Court to Expunge the FLARPL's*

■ Still, the question remains whether Turkanis had any mechanism for expunging the FLARPL's after the court had awarded the property to him. The true crux of this matter is whether section 2033 or 2034 permits the court to expunge FLARPL's when a dispute arises as to their propriety after the FLARPL's have been recorded. We determine that section 2034, subdivision (c) so permits the court.

■ "In interpreting a statute, our function is to ascertain the intent of the Legislature in enacting the statute and to effectuate the purpose of the statute. We begin with the statute's language, giving its words their usual and ordinary meaning, construing them in context. [Citation.] If the statutory language is unambiguous, we presume that the Legislature meant what it said," and the plain meaning of the statute governs. (*County of San Bernardino v. Calderon* (2007) 148 Cal.App.4th 1103, 1108 [56 Cal.Rptr.3d 333]; see *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 29 [34 Cal.Rptr.3d 520].) If the statutory language is ambiguous, permitting more than one reasonable interpretation, only then may the court consider extrinsic aids to interpretation. (*County of San Bernardino v. Calderon, supra,* at p. 1108.) Resort to legislative history is thus appropriate only when statutory language is ambiguous. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc., supra,* at p. 29.)

■ The relevant statute is unambiguous on the issue before us. Subdivision (c) of section 2034 gives the court "jurisdiction to resolve *any dispute* arising from the existence of a [FLARPL]." (§ 2034, subd. (c), italics added.) This broad catchall provision gives the court jurisdiction to resolve disputes over the propriety of existing FLARPL's, whenever they may arise. The plain language of the subdivision does not impose any timing requirement or otherwise limit the court's ability to revisit the propriety of a FLARPL. Moreover, as this subdivision is separate from the other parts of the statutory scheme relating to the ex parte objection process (§ 2033, subd. (c)), it contemplates disputes apart from the ex parte objection process. The parties engage in the ex parte objection process before the FLARPL exists, and section 2034, subdivision (c), contemplates disputes when the FLARPL is

already in "existence." ▮▮▮ To read this part of the statute as merely referring to the ex parte objection process and no other disputes would render it superfluous, and we are to avoid interpretations that render any part of a statute superfluous. (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1207 [48 Cal.Rptr.3d 108, 141 P.3d 225].)

Kramer and Spitzer acknowledge in their briefing that the encumbering spouse may bring an application under section 2034 to expunge a lien if that party concludes he or she improvidently executed the FLARPL. Leading commentators agree, although they point out that either party, whether the encumbering spouse or the nonencumbering spouse, may seek a determination on the enforceability of a FLARPL: "Section 2034 clearly states a court determination on enforceability of the lien may be made on 'application' of *either party* (Fam.C. §2034(a))—including, therefore, the encumbering party. This provision seems to give a party who improvidently executed the attorney lien encumbrance a 'way out' (e.g., as where he or she subsequently determines the lien would impede a practical equal community property division or otherwise wishes to avoid liquidation of the encumbered property)." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2012) ¶ 1:296, p. 1-96.6 (rev. # 1, 2012).)

If the encumbering party can seek to avoid a FLARPL's enforcement after "improvidently" executing it, we see no reason why the nonencumbering party cannot attempt to do the same.

At oral argument before this court, Kramer and Spitzer appeared to concede that section 2034, subdivision (c) permits a court to revisit the propriety of a FLARPL after it has been recorded, but both cited very limited circumstances in which this would be permitted. Kramer argued the court could do this only when the encumbering spouse had not complied with the procedural requirements for duly recording the FLARPL, and the nonencumbering spouse wanted to expunge the procedurally deficient FLARPL. Spitzer argued the court could do this when the amount of the lien needs to be revisited based on the unreasonableness of the attorney fees incurred. There is no basis in the statute to restrict the disputes that the court may address under the broad catchall provision to these two very limited circumstances. We do not have the power to rewrite the statute in this manner. (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175].) Only the Legislature may do this.

Kramer and Spitzer additionally argue that the purpose of the statutory scheme—to permit parties "to retain or maintain legal counsel" (§ 2033, subd. (a)), especially economically weaker parties—will be frustrated by our holding that the nonencumbering spouse may challenge the propriety of a

FLARPL after recordation. They assert that capable family law attorneys will have no incentive to accept clients who have only FLARPL's to offer if the attorneys know that the court can expunge duly recorded FLARPL's at any time. While our holding engenders some risk for attorneys who accept FLARPL's, trial courts routinely adjudicate the propriety and reasonableness of fee awards under the Family Code and have broad discretion to do so, and attorneys are thus routinely taking the risk that the court will not reimburse all of their fees. (§ 2030, subd. (a) [court may order one party to contribute to another party an amount "reasonably necessary for attorney's fees" based on assessment of parties' incomes and needs]; § 2032, subd. (a) [court may award attorney fees and costs when the making and amount of the award are "just and reasonable" under the parties' relative circumstances].) Even under Spitzer's view of section 2034, subdivision (c), a court would be permitted to revisit the amount of a duly recorded FLARPL and reduce it, perhaps substantially, if the court determined that it did not represent reasonable fees. Such a scheme is nearly as risky for attorneys as a scheme that permits the court to extinguish a FLARPL.

Kramer and Spitzer also argue that the doctrine of waiver or equitable estoppel prohibits Turkanis from moving to expunge the FLARPL's after he initially consented to them encumbering 1234 Bundy. We agree with Kramer and Spitzer that, as an abstract matter, the doctrines of waiver and equitable estoppel could possibly bar a party from seeking to expunge a FLARPL. They do not have that effect here, however, for reasons discussed below.

■■■ "[T]he doctrine of equitable estoppel is a rule of fundamental fairness whereby a party is precluded from benefiting from his inconsistent conduct which has induced reliance to the detriment of another [citations]. Under well settled California law four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury . . . ." (*In re Marriage of Valle* (1975) 53 Cal.App.3d 837, 840–841 [126 Cal.Rptr. 38], fn. omitted.)

■■■ " ' "[W]aiver is the intentional relinquishment of a known right after knowledge of the facts." [Citations.] The burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver" [citation].' " (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31 [44 Cal.Rptr.2d 370, 900 P.2d 619].) "Whether a waiver has occurred depends solely on the intention of the waiving party." (*Velasquez v. Truck Ins. Exchange* (1991) 1 Cal.App.4th 712, 722 [5 Cal.Rptr.2d 1].)

Generally, the existence of either estoppel or waiver is a question of fact for the trial court, whose determination is conclusive on appeal unless the opposite conclusion is the only one that we can reasonably draw from the evidence. (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 319 [24 Cal.Rptr.2d 597, 862 P.2d 158]; *Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].)

Turkanis contends that Kramer and Spitzer have forfeited their arguments for waiver and equitable estoppel because they did not assert them in the trial court. (*Hepner v. Franchise Tax Bd.* (1997) 52 Cal.App.4th 1475, 1486 [61 Cal.Rptr.2d 341] ["Points not raised in the trial court will not be considered on appeal."].) We agree. While they generally argued that expunging the FLARPL's would be unfair or inequitable after Turkanis had consented to them and they had acted in reliance on them, they did not outline even the basic contours of the doctrines as we have done in the foregoing paragraphs. Their generalized arguments regarding unfairness did not suffice to put the court on notice that it should make essential factual findings regarding key issues, such as (1) whether Turkanis intended to relinquish a known right; (2) whether, when he consented to the FLARPL's, he actually knew the facts on which he later based his argument that the FLARPL's would result in an inequitable division of property; or (3) whether Kramer and Spitzer were truly ignorant of these same facts at the time they obtained the FLARPL's. The trial court, as the finder of fact, was positioned to make these determinations from any argument and evidence bearing on these issues. The parties did not have a chance to present such argument and evidence because Kramer and Spitzer never articulated the specific elements of equitable estoppel or waiver. The issues were thus not preserved for appeal.

■ In sum, section 2034, subdivision (c) gives the trial court jurisdiction to revisit the propriety of a FLARPL at any time, as the trial court did in this case. Our holding rests on the plain language of the statute. If the prerecordation, ex parte objection process is the only time when parties may contest the propriety of a FLARPL, it is the task of the Legislature and not the courts to make such an amendment to section 2034.

2. *The Trial Court Did Not Err in Denying Price's Request for a Statement of Decision*

■ Kramer and Spitzer contend that the trial court erred in failing to issue a statement of decision on the motion to expunge, even though it issued a written order granting the motion. This argument is unavailing. Code of Civil Procedure section 632 requires the trial court to issue a statement of decision only after a bench trial, when any party requests it. The general rule, however, is that a trial court need not issue a statement of decision after a

ruling on a motion. (*Mechanical Contractors Assn. v. Greater Bay Area Assn.* (1998) 66 Cal.App.4th 672, 678 [78 Cal.Rptr.2d 225].) A court may exercise its discretion to issue a statement of decision in instances other than trial, but nothing requires it to do so. (*In re Marriage of Feldman, supra,* 153 Cal.App.4th 1470, 1497.) The trial court thus did not abuse its discretion.

### 3. The Trial Court Did Not Err in Failing to Join Kramer and Spitzer as Parties to the Trial

Relying on *Ramirez,* Kramer and Spitzer maintain that the trial court erred in failing to join them to the action prior to entering a judgment that extinguished their FLARPL's. This argument also lacks merit.

*Ramirez* held that an attorney who had a FLARPL was an indispensable party to the nonencumbering spouse's motion for an order vacating the FLARPL. (*Ramirez, supra,* 198 Cal.App.4th at p. 344.) Because that attorney FLARPL-holder did not have notice of the motion to vacate the FLARPL and did not participate in the proceedings, the *Ramirez* court reversed the trial court's order requiring the attorney to vacate her FLARPL. (*Id.* at p. 345.)[6]

*Ramirez* is inapposite here. There can be no dispute that Kramer and Spitzer were parties to the motion to expunge proceedings. The trial court did not expunge the FLARPL's in their absence and thereby run afoul of principles of due process. Kramer and Spitzer contend that the court did just this when the judgment stated Turkanis was taking 1234 Bundy free of any encumbrances (except the lien for delinquent taxes). Thus, they say, Kramer and Spitzer were indispensable parties to the allocation trial leading up to the judgment. But, regardless of the statement in the judgment, the transcript is clear that neither the court nor Turkanis thought the FLARPL's were expunged by the judgment. That was why the court ordered Turkanis to bring a separate motion to expunge and to notice Kramer and Spitzer with the motion. *Ramirez* did not require the trial court to join them to the proceedings before the motion to expunge.

### 4. The Trial Court Did Not Err in Limiting Kramer's Fee Award on His Borson *Motion*

Preliminarily, Turkanis contends that Kramer did not timely appeal from the *Borson* order because the notice of appeal identified Price as the sole appellant. While this is true, the appellants' briefs are filed on behalf of Price,

---

[6] In *Ramirez,* the nonencumbering spouse tried to vacate the FLARPL because the encumbering spouse allegedly did not follow the notice requirements of section 2033, and the nonencumbering spouse claimed that he was not aware of the FLARPL until after judgment in the dissolution matter. (*Ramirez, supra,* 198 Cal.App.4th at p. 340.)

who no one disputes timely appealed, as well as Kramer. We thus will consider the merits of the *Borson* appeal.

The sole contention of error in the opening brief with respect to the *Borson* motion is that the trial court abused its discretion when it substantially reduced the fees to Kramer based on the finding that Turkanis deserved an offset for section 271 sanctions. In the reply brief, Kramer and Price assert for the first time that the trial court also abused its discretion by not scrutinizing Kramer's billing statements or analyzing the work that Kramer performed for Price that was the subject of the *Borson* motion. We decline to consider this belated argument. (*Nordstrom Com. Cases* (2010) 186 Cal.App.4th 576, 583 [112 Cal.Rptr.3d 27] ["points raised for the first time in a reply brief on appeal will not be considered, absent good cause for failure to present them earlier . . ."].) Even were we to rule on the argument, it would not assist Price and Kramer. The record is clear that the court did, in fact, review and analyze Kramer's bills. As just one example, the court's order summarized the work he did and analyzed how much of his work was attributable to litigation over the Bundy properties' management.[7]

As to the argument regarding section 271, Price and Kramer argue that the court erred because it could not award section 271 sanctions as an offset; instead, Turkanis had to comply with due process requirements by properly noticing a section 271 motion. Section 271 states in pertinent part: "[T]he court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An award of attorney's fees and costs pursuant to this section is in the nature of a sanction." (§ 271, subd. (a).)

We disagree with Price and Kramer that the trial court erred here. Although the court's order discussed section 271 and determined that Price's conduct warranted such sanctions, it is clear from the court's thorough discussion that it based the award on the totality of the circumstances, and did not arbitrarily reduce the award to $39,000 as a sanction.

The factors the court considered to arrive at the award amount were proper. Section 2030 permitted the trial court to order payment of attorney fees and

---

[7] Turkanis has filed a motion to strike substantial portions of the reply brief on the ground that it is replete with belated arguments raised for the first time. We agree with him regarding the new argument Price and Kramer make for reversing the *Borson* motion, as discussed above. We also agree with him that Kramer and Spitzer did not preserve for appeal the waiver and equitable estoppel arguments discussed in part 1.c. of the Discussion. Because we decline to consider these arguments, the motion to strike is moot and therefore denied.

costs as between the parties based upon their "abilities to pay" and their "respective incomes and needs" in order to "ensure that each party has access to legal representation to preserve each party's rights." (§ 2030, former subd. (a)(1)–(2).)[8] The court may award attorney fees under section 2030 "where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a).) "In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320." (§ 2032, subd. (b).) The parties' circumstances described in section 4320 include, among other things, the earning capacity of each party, the parties' marketable job skills, their obligations and assets, the duration of the marriage, and any "other factors the court determines are just and equitable."

▮ "Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances." (§ 2032, subd. (b).) The court should limit an award to fees that were reasonably necessary, including by taking into account overlitigation. (*Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 255 [91 Cal.Rptr.3d 241].) " 'The exercise of sound discretion by the trial court in the matter of attorney's fees includes also judicial evaluation of whether counsel's skill and effort were wisely devoted to the expeditious disposition of the case.' " (*In re Marriage of Behrens* (1982) 137 Cal.App.3d 562, 576 [187 Cal.Rptr. 200].) "[S]ervices which have no apparent effect other than to prolong and to complicate domestic litigation cannot be deemed 'reasonably necessary' [citation] 'to properly litigate the controversy . . . .' " (*Ibid.*)

Thus, consideration of Price's litigation conduct and a reduction for fees attributable to the unreasonable conduct was proper, even without reference to section 271. The court noted that Kramer represented Price in at least some of that unreasonable conduct to the tune of approximately $33,000. But more importantly, Kramer's and Price's suggestion that the $39,000 award was based entirely on her bad litigation conduct is not well taken. The court's award clearly considered the parties' respective incomes and expenses, their assets and liabilities, their earning capacities, the substantial amount that Turkanis still owed his own attorneys and would owe based on the pending

---

[8] We cite to the version of section 2030 that was in effect in 2010 when the court heard and ruled on the *Borson* motion. The Legislature amended section 2030 effective January 1, 2011.

appeals, the fact that Turkanis was supporting the parties' daughter, and the fact that, after this award, he would have paid approximately $164,000 of Price's fees and costs.

In sum, we do not agree with Price and Kramer that the trial court erred in taking into account Price's litigation conduct. Nor do we agree that the court arbitrarily fixed the award at $39,000 as a section 271 sanction. We will not reverse the award.

## DISPOSITION

The orders are affirmed. Respondent to recover costs on appeal.

Rubin, Acting P. J., and Grimes, J., concurred.

A petition for a rehearing was denied February 27, 2013, and the petition of appellants Brian J. Kramer and Daniel B. Spitzer for review by the Supreme Court was denied April 17, 2013, S209197.