Filed 5/4/22; Certified for Publication 6/2/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of CHRISTINE NAKAMOTO and DANIEL HSU.<br><br>CHRISTINE NAKAMOTO,<br><br>    Respondent,<br><br>      v.<br><br>DANIEL HSU,<br><br>    Appellant;<br><br>BRION CORPORATION et al.,<br><br>    Claimants and Respondents. | G059108<br><br>(Super. Ct. No. 11D006853)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, James L. Waltz, Judge. Affirmed.

Masson & Fatini, Richard E. Masson and Susan M. Masson for Appellant.

Minyard Morris, Alexander Payne; Garrett C. Dailey for Claimants and Respondents.

\*        \*        \*

In this appeal, Daniel Hsu (Daniel) asks that we reverse the trial court's decision denying him need-based attorney fees under Family Code section 2030.[1]  The actual dispute underlying his request for attorney fees is not currently at issue.  However, it is integral to the court's attorney fees ruling and is briefly described below.

This is a marriage dissolution proceeding between Daniel and Christine Nakamoto (Christine; together, the spouses).  But the dispute at issue is between Daniel and his two siblings, Charleson Hsu (Chau) and Melissa Hsu See (Melissa).  After their parents passed away, Daniel claimed Chau was concealing a portion of his inheritance.  The siblings met on March 1, 2006, to discuss Daniel's claims.  They reached an agreement at the meeting, which Daniel documented on a two-page handwritten memorandum (the Handwritten Agreement).  Among other things, the Handwritten Agreement stated Daniel was to be paid $4 million.  Several months later, the three siblings executed a formal Compromise Agreement for Structured Settlement (Compromise Agreement).  The Compromise Agreement contained many of the terms set forth in the Handwritten Agreement but did not mention the $4 million payment.

The spouses claimed Daniel was never paid the $4 million, which would be a community asset, and that it is still owed to him under the Handwritten Agreement.  Chau and Melissa asserted the Handwritten Agreement was not a binding contract and that Daniel had already been paid $4 million through a separate transaction outside the Compromise Agreement.  Chau, Melissa, and several business entities they own (together, claimants) were involuntarily joined to this dissolution proceeding to settle this dispute.  At trial, the primary question facing the lower court was whether the Handwritten Agreement or the Compromise Agreement was the enforceable contract.  The court found in favor of claimants, ruling the Compromise Agreement was

---

[1]  Since several parties share the same surname, we refer to the parties by their first name to avoid confusion.  All further undesignated statutory references are to the Family Code.

enforceable while the Handwritten Agreement was not.  Daniel sought interlocutory review of this order, but his request was denied.

Meanwhile, over the course of Daniel's litigation against claimants, the court awarded him $140,000 in attorney fees under section 2030.  After the court issued a tentative ruling finding the Handwritten Agreement was not enforceable, Daniel requested an additional $50,000 for attorney fees incurred during trial plus another $30,000 to appeal.  The court denied his request.  As to the fees incurred during trial, the court found Daniel had overlitigated this case.  It denied Daniel's request for appellate fees due to his failure to show reasonable grounds to appeal.  Daniel now appeals this denial, arguing the court erred by denying his request for attorney fees.

We affirm the court's postjudgment order.  The court's finding that Daniel overlitigated this case is supported by substantial evidence.  As to the denial of appellate fees, the trial court acted within its discretion in finding Daniel failed to show reasonable grounds to appeal.  Daniel's purported grounds for challenging the court's ruling in a prospective appeal are conclusory and only focus on the evidence favorable to his claims. He fails to address any of the evidence supporting the court's conclusion that Daniel and his siblings did not intend for the Handwritten Agreement to be a final contract.  Nor does he explain how this finding is unsupported by substantial evidence.  As such, we cannot conclude the trial court acted arbitrarily or capriciously when it determined Daniel had not shown reasonable grounds to appeal.


I

FACTS AND PROCEDURAL HISTORY

Daniel and Christine married in 2002.  Christine filed this marriage dissolution action in 2011.  The underlying dispute in this appeal concerns a disagreement between Daniel and his two siblings, Chau and Melissa, over Daniel's family inheritance.  In short, Daniel believes Chau, Melissa, and several family-owned

3

business entities, including Sun Ten Pharmaceutical, California (Sun Ten) and Brion Corporation owe him $4 million.[2] It is undisputed this alleged sum is a community asset per a transmutation agreement Daniel signed the day he wed Christine. Daniel litigated this claim against claimants in the divorce proceeding and lost. While this appeal only concerns the court's denial of Daniel's request for attorney fees, the underlying conflict is material to the fee issue. Thus, we review the history of this dispute below.[3]

*A. Background*

Daniel, Chau, and Melissa are the only children of Dr. Hong-Yen Hsu (Hong-Yen) and Dr. Ruth Lin-Run Hsu (Ruth), who accumulated substantial wealth during their lifetimes. Hong-Yen and Ruth were originally from Taiwan, where they started several businesses, and immigrated to the United States in the 1970s. Hong-Yen passed away in 1991, and Ruth passed away in 1998. Ruth was the executor of Hong-Yen's estate after his death, and all three children were co-executors of Ruth's estate when she passed. The Final Order of Distribution for Ruth's estate was filed in 2000, and the estate's final tax return was filed in 2002. Still, the total value of Ruth's estate was opaque and appears to be a source of friction. During trial, Daniel estimated her estate was worth $60 million, which Chau disputes. We have not been pointed to any other evidence in the record that either substantiates or discredits Daniel's estimate. Regardless, the exact value of her estate is immaterial to this appeal.

Around 2005, Daniel became convinced Chau was hiding a portion of their parents' estate from him. He hired an attorney to assist him in obtaining his portion of

---

[2] Other claimants involved in this appeal are Brion Herbs Corporation and Sun Ten Museum. Daniel's opening brief sometimes refers to Sun Ten as STPCA.

[3] Christine was also involved in the litigation over Daniel's inheritance. She moved for attorney fees at the same time as Daniel, and the court also denied her request. Since she does not appeal that ruling, we focus on the facts relevant to Daniel.

4

these allegedly hidden assets. The three siblings met in Irvine on March 1, 2006, to address Daniel's allegations. Though Daniel and Chau had both consulted with attorneys about Daniel's claims, no attorneys attended the meeting. Rather, it was informally mediated by a mutual family friend, Herb Shen (Shen). After hours of discussion, the siblings reached a general agreement. It was documented in the Handwritten Agreement, a terse two-page memorandum handwritten by Daniel partially in Chinese and partially in English. All three siblings and Shen (as a witness) signed the Handwritten Agreement on March 1, 2006.

The only portion of the Handwritten Agreement written in Chinese is the first half of first sentence, but the parties agree on its English translation. The remainder is written in English. In its entirety, the Handwritten Agreement states, "'[$4,000,000 paid to Daniel over eight years] plus employment agreement until May 2011 annual salary of US $100,000.00.[4] Brion Corporation's stock in Aurie, Lin-Ling, Hansdale name transfer back to company. No touch all the corporation and company from this point on including Foundation. [¶] Brion Corporation's stock in the name of Aurie, Lin-Ling and Hansdale the buy back amount not to exceed US $100,000.00.'"

Aurie, Lin-Ling, and Hansdale are Daniel's children from a prior marriage. Brion Corporation is a California Corporation that was previously owned by Hong-Yen and Ruth. Following their deaths, its shares were owned by the Chau, Melissa, and Daniel. Aurie, Lin-Ling, and Hansdale appear to have owned an indirect interest in Brion Corporation shares through their father, Daniel. It appears the "Foundation" referred to in the Handwritten Agreement is the Hong-Yen and Lin-Run Hsu Charitable Foundation (the Foundation), a California nonprofit public benefit corporation.

In the underlying litigation, the parties dispute whether the Handwritten Agreement was meant to be a standalone contract or a memorandum of general points to

_____

[4] The bracketed portion of this sentence was written in Chinese. The English text within the brackets is Daniel's translation, which the parties generally agree is accurate.

be later incorporated into a formal written contract. The primary disagreement appears to be whether or not Daniel is still owed the $4 million set forth in the Handwritten Agreement. The conflict arises from the parties' divergent perspectives of the events that occurred after March 1, 2006.

It is undisputed that on September 12, 2006, Daniel met with Shen in Taiwan and signed several documents. Chau and Melissa were not present at this meeting. One of these documents, the primary document at issue here, was the nine-page Compromise Agreement entered into by Daniel, Chau, and Melissa. Though it was signed by Daniel in September 2006 (it is unclear when Chau and Melissa signed), the Compromise Agreement provided that "[u]pon full execution of this Agreement, the parties agree that it shall be deemed effective as of March 1, 2006."

Under the Compromise Agreement, Daniel agreed to give up all claims to his parents' estate and to sell his shares in Brion Corporation to Chau for $100,000, eliminating his interest in the company. The Compromise Agreement further required Daniel to resign as director of the Foundation and as a cotrustee of a subtrust of the Hsu Family Trust, and he concurrently executed separate formal resignations. In exchange, Brion Corporation would retain Daniel as a senior manager with a salary of $100,000 per year plus health insurance, and he would be employed until the earlier of his death, incapacity, or his 66th birthday, which was in May 2011. Significantly, though, the Compromise Agreement did not mention the $4 million payment discussed at the March 1, 2006 meeting.[5]

The same day he signed the Compromise Agreement, Daniel also signed various documents concerning a parcel of real property on Roosevelt Road in Taipei,

_____

[5] On October 11, 2006, Daniel executed a Modification of Compromise Agreement which revised the payment structure for Daniel's salary from Brion Corporation. That same day, he also executed a Share Purchase Agreement and an Assignment of Corporate Shares Separate from Certificate, which formally transferred Daniel's Brion Corporation shares back to Brion Corporation.

Taiwan (the Roosevelt Property). Daniel owned the land and co-owned a building on the property with Chau. Initially, Daniel had planned to donate the Roosevelt Property to a local theological college. To facilitate the transfer, Chau and Daniel created a real estate trust in March 2006 naming the college as the beneficiary of the Roosevelt Property. At some point prior to the September 12 meeting, however, the donation became unviable because the college could not afford the transfer tax. After the donation fell through, Melissa and Chau agreed to buy the property from Daniel. The purchase was documented through a property sale agreement, signed on September 12, 2006, in which Chau and Melissa purchased the Roosevelt Property for $4 million (the Chau/Melissa Sale Agreement). Under the Chau/Melissa Sale Agreement, payments would be made over eight years into a Taiwanese bank account owned by Daniel. Daniel also concurrently executed a Cancellation of Trust for the real estate trust previously created to facilitate the donation to the college.

While the parties largely agree on these general facts, they dispute the purpose behind the sale of the Roosevelt Property to Chau and Melissa. According to Chau, Daniel wanted the $4 million agreed upon at the March 1, 2006 meeting paid outside the United States, which Chau asserts was done to avoid American taxes. When the donation of the Roosevelt Property fell through, Chau suggested to Daniel around July 2006 that he could purchase the Roosevelt Property from Daniel to pay him the $4 million discussed on March 1, 2006. Since Daniel had planned on donating the Roosevelt Property, its market value was irrelevant to him. In contrast, Daniel insists the sale of the Roosevelt Property was unrelated to the $4 million discussed on March 1, 2006. As Daniel recounts, he learned from Shen on September 12, 2006, that the college could not accept his donation and that his siblings were interested in purchasing the Roosevelt Property. Since the property could not be donated, he decided to sell it to his siblings for $4 million, which generally reflected the property's market value.

7

Chau and Melissa subsequently made two payments to Daniel under the Chau/Melissa Sale Agreement in December 2006 and May 2007 totaling $350,000. Sometime in 2007, Shen approached Daniel about Sun Ten purchasing Daniel's interest in the Roosevelt Property rather than Chau and Melissa. Sun Ten had been established by Hong-Yen and Ruth in 1946, and Chau was chairman of its board of directors at the time. Daniel and Sun Ten signed a new Property Sale Agreement on June 7, 2007, in which Sun Ten agreed to purchase the Roosevelt Property for $4 million paid over eight years (Sun Ten Sale Agreement). Like the Chau/Melissa Sale Agreement, payments under the Sun Ten Sale Agreement would be paid to a Taiwanese bank account held by Daniel. Daniel, Melissa, and Chau then executed an agreement cancelling the sale of the Roosevelt Property from Daniel to his two siblings. Sun Ten then reimbursed Chau and Melissa for the $350,000 they had paid Daniel.

Chau testified that the parties intended for Sun Ten to assume the obligation of him and Melissa to pay Daniel $4 million. Likewise, the Sun Ten Sale Agreement attached the Compromise Agreement as an exhibit and incorporated its provisions. Specifically, the Sun Ten Sale Agreement, as translated from Chinese to English, stated that "[i]n case that [Daniel] breaches any of the obligations mentioned in [the Compromise Agreement] during the term of payment by [Sun Ten], [Sun Ten] must cease the payment of the aforesaid price according to notification of the third party [Chau]; [Daniel] agrees that [Sun Ten] shall make liquidation of the compensation to [Chau] within the scope of claim by [Chau] for [Daniel's] violation of any of its aforesaid obligations with the unpaid price on behalf of [Daniel]."

Sun Ten made payments to Daniel for the Roosevelt Property up until 2013. He did not receive any payments from his siblings during this time period, nor did he claim they owed him money under the Handwritten Agreement.

8

*B. Trial in the Divorce Proceeding*

Christine filed for divorce on July 21, 2011, and later involuntarily joined claimants to the proceeding on grounds they were holding community property. Claimants responded by demanding indemnity from the spouses under a provision in the Compromise Agreement that required Daniel to indemnify claimants for claims made against them relating to the agreement (the indemnity provision). The spouses denied claimants' indemnity request and argued the Compromise Agreement was invalid.

The spouses' claims against claimants proceeded to trial, in which the primary dispute was whether the Handwritten Agreement or the Compromise Agreement was enforceable. The spouses alleged claimants owed them $4 million under the Handwritten Agreement. Claimants maintained the Handwritten Agreement was never intended to be a binding contract. Rather, according to them, it was only a summary of the deal points discussed at the March 1, 2006 meeting, and all parties understood that formal contracts would be subsequently drafted and signed by the parties. They also asserted that even if the Handwritten Agreement was found to be a valid contract, it was too vague to enforce.

The court estimated trial would last three days, and none of the parties disputed this estimate. Trial commenced in November 2019. However, it consumed a total of seven trial days and concluded in January 2019. The court issued a detailed 18-page final statement of decision in February 2020 (the statement of decision), in which it ruled the Handwritten Agreement was not a valid contract and, even if it were valid, it would be unenforceable. Instead, the court found the Compromise Agreement was valid, enforceable, and controlling. In the court's opinion, "***this was not a close judicial call***."

In explaining the basis for its ruling, the court found Chau to be "a more accurate reporter of historical events and found his testimony truthful. On the other hand, the court found Daniel to be less accurate as to historical events, his trial testimony less

9

credible and at times his testimony [was] not truthful." Further, after the March 1, 2006 meeting, "Daniel's correspondence makes very clear that . . . he was anticipating the forthcoming Compromise Agreement . . . , something he (falsely) denied at [the] time of the bifurcated trial. [B]ased on the totality of the correspondence and based on the post [March 1, 2006] conduct by the parties and third parties, and based on the actual drafting of many agreements including the drafting and execution of the Compromise Agreement . . . , all of that corroborating Chau's testimony, the court [found] that at the [March 1, 2006 meeting], the siblings did not have a complete meeting of the minds . . . , and . . . never intended the Handwritten Agreement . . . [to] serve as a binding contract." Rather the court concluded the parties reached a deal in principle to settle their dispute "subject to the drafting and execution of a series of contracts . . . . That was followed by party performance (over years) to include Daniel receiving bargained-for benefits until the benefits due Daniel expired under contract." The court also noted that even if the Handwritten Agreement were a valid and final contract, "the agreement itself [was] unintelligible and too vague to enforce."

Daniel requested interlocutory review of the trial court's ruling, but this court denied that request. As such, Daniel cannot directly appeal this ruling until final judgment has been entered in the dissolution proceeding. (See *In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 756 [Generally, "[u]nder the one final judgment rule, '"an appeal may be taken only from the final judgment in an entire action."'"].)

*C. Requests for Attorney Fees*

The spouses each requested need-based attorney fees from claimants under section 2030 before, during, and after the trial. Most of their requests were at least partially granted. In January 2015, the court ordered Brion Corporation to pay $60,000 in fees to Christine and $50,000 in fees to Daniel. In December 2017, about a year before trial, the spouses both filed motions seeking incurred and future fees. Christine requested

10

$985,000, while Daniel sought $500,000. The court denied their request for incurred fees, but it awarded prospective fees in the amount of $35,000 to Christine and $70,000 to Daniel for the upcoming trial. The spouses then both filed motions for reconsideration, which the court partially granted, resulting in an extra $20,000 in supplemental fees to each spouse. In total, by the time trial commenced in November 2018, the court had already awarded fees in the amount of $140,000 to Daniel and $115,000 to Christine.

After it became clear trial would go longer than the initial three-day estimate, the court ordered claimants in December 2018 to pay another $10,000 in attorney fees to each spouse. Then, on the final day of trial in January 2019, the spouses again moved for more attorney fees. The court reserved the issue. After trial, it issued tentative rulings finding the Compromise Agreement was enforceable and controlling and the Handwritten Agreement was not. Christine subsequently submitted a request for $293,934.80 in fees incurred plus another $100,000 in prospective fees for appeal, while Daniel requested $50,000 for fees incurred and $30,000 for appeal. The trial court denied these requests on two separate grounds, and it issued separate rulings explaining each.

The first ruling (the attorney fees ruling) found the spouses had failed to show their respective fee requests were reasonable. It explained the fees previously awarded by the court were sufficient, as they reasonably allowed each party the ability to retain counsel of their choice and to fairly litigate the matter. The court determined the request for incurred fees was also unreasonable because the spouses had overlitigated this case. As to the requests for appellate fees, the court ruled that the spouses had failed to show reasonable grounds for appeal.

In the alternative, the second ruling (the indemnity ruling) held the spouses were barred from seeking attorney fees from claimants under the indemnity provision. The court found "Daniel ha[d] an obligation to defend and indemnify Claimants for all matters embraced by the indemnity provision, which necessarily include[d] all costs incurred and/or related to this action." Due to the indemnity provision, the spouses could

11

not seek need-based fees against claimants under section 2030. As the court explained, "Daniel bargained for indemnity and contracted any rights to seek Family Code fees away." (Italics omitted.)

In this appeal, Daniel contends the trial court wrongly denied his request for $50,000 in incurred fees and $30,000 in prospective appellate fees. We are unpersuaded.

## II

## DISCUSSION

*A. Section 2030*

"The denial of a request for attorney fees pendente lite is appealable because it possesses all the elements of a final judgment on the issue of whether a spouse may be able to obtain such fees." (*Askew v. Askew* (1994) 22 Cal.App.4th 942, 964, fn. 37; *In re Marriage of Weiss* (1996) 42 Cal.App.4th 106, 119 ["[A] direct appeal lies from a pendente lite attorney fees order where nothing remains for judicial determination except the issue of compliance or noncompliance with its terms"].)

Here, Daniel sought fees under section 2030. This statute "permits the trial court to order payment of attorney fees and costs as between the parties based upon their 'ability to pay' and their 'respective incomes and needs' in order to 'ensure that each party has access to legal representation to preserve all of the party's rights.'" (*In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 829 (*Rosen*).) "[T]he purpose of section 2030 is *not* the redistribution of money from the greater income party to the lesser income party. Its purpose is *parity*: a fair hearing with two sides equally represented. The idea is that both sides should have the opportunity to retain counsel, not just . . . the party with greater financial strength." (*Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 251-252.) When issues involving third parties are raised, the court may award

12

attorney fees against the third party in "an amount reasonably necessary to maintain or defend the action on the issues relating to that party." (§ 2030, subd. (d).)

A court may award fees under section 2030 "'where the making of the [fee] award, and the amount of the award, are just and reasonable under relative circumstances of the respective parties.'" (*Rosen*, *supra*, 105 Cal.App.4th at p. 829.) "In determining what is just and reasonable, 'the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately . . . .' [Citation.] In addition to the parties' financial resources, the court may consider the parties' trial tactics." (*In re Marriage of Sharples* (2014) 223 Cal.App.4th 160, 164-165.) "The court should limit an award to fees that were reasonably necessary, including by taking into account overlitigation." (*In re Marriage of Turkanis & Price* (2013) 213 Cal.App.4th 332, 356.) "[S]ervices which have no apparent effect other than to prolong and to complicate domestic litigation cannot be deemed 'reasonably necessary' [citation] 'to properly litigate the controversy' [citation] and may properly be disregarded by a trial court determining whether and in what amount to order one party to contribute to the cost of the other's representation." (*In re Marriage of Behrens* (1982) 137 Cal.App.3d 562, 576; see *Karton v. Ari Design & Construction, Inc.* (2021) 61 Cal.App.5th 734, 744 ["A reduced award might be fully justified by a general observation that an attorney overlitigated a case"].)

A court's denial of attorney fees under section 2030 is reviewed for abuse of discretion. (*Rosen*, *supra*, 105 Cal.App.4th at p. 829.) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712, fns. omitted.)

13

*B. Attorney Fees Incurred at Trial*

In the attorney fees ruling, the trial court denied Daniel's request for an additional $50,000 in fees incurred at trial because Daniel had overlitigated the case. Daniel argues this finding is not supported by substantial evidence. We disagree.

Under the substantial evidence standard, "'[o]ur review is limited to a determination whether there is any substantial evidence, contradicted or uncontradicted, that supports the finding. [Citation.] In so reviewing, all conflicts must be resolved in favor of [the prevailing party] and all legitimate and reasonable inferences must be indulged to uphold the finding.'" (*In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, 1472.) "[W]e examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference." (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1151.) We do "not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court. [Citations.] The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

In the attorney fees ruling, the court concluded "the additional four trial days [were] wholly un-necessary. [W]hile Daniel presented many challenges to documents and events, and a lot of trial was allocated to chase down facts and authenticate documents, in the end, Daniel conceded what he at first disputed." The court also provided several examples of Daniel's conduct supporting this conclusion. First, it noted he extended trial by challenging "authentication of foreign language documents, business records and authentication of foreign language 'signature stamps.'" Second, "Daniel disputed/contested any consideration as and for the Compromise Agreement . . . and many hours were allocated to challenge and refute Daniel's claims and testimony, [with] the court later declaring substantial portions of his testimony mis-leading, not

14

credible and even false." Third, "[w]ithin final arguments and proposed findings, both Daniel and Christine abandon[ed] positions asserted before and during trial, making unnecessary certain trial hours." The record supports these findings.

As to the first example, many of the documents at issue contained signature stamps, also referred to as "medallions," that are commonly use in Taipei to sign documents. The medallions of Daniel and Chau contained Chinese characters that corresponded to their Chinese names. Daniel admits that early in the trial, his counsel hesitated to stipulate to the authenticity of documents signed with medallions because Daniel "questioned whether [his] medallion had been out of his possession." Counsel later stated this remark was incorrect and confirmed Daniel had signed each of the documents at issue. Though Daniel concedes this mistake, he argues that after "discovering the error, he promptly stipulated to authentication of these documents" and that this error did not extend the trial. However, it is undisputed that Daniel took five trial days to discover the purported error. As the court explained, "Daniel objected to each 'Medallion Guaranteed' exhibit, many of which contained Daniel's *wet signature* and then, after five days of trial, Daniel's counsel finally represented, 'I confirm that each one of the documents . . . were signed, if they were signed by Daniel, by him, and his medallion was used by him or with his permission.'"

The record supports the court's finding that claimants were forced to expend trial time authenticating signature stamps on documents based on Daniel's refusal to stipulate to their authenticity due to the claimed loss of his medallion. For example, when exhibit 3241 (a trust document relating to the Roosevelt Property) was introduced, claimants asked Chau a series of questions to authenticate Daniel's wet signature and signature stamp. They moved to admit the exhibit, but Christine objected on grounds that Daniel had challenged the use of his medallion. Claimants then had to wait until Daniel was on the witness stand to ask him whether exhibit 3241 contained his signature.

15

Likewise, there are other instances in the record in which claimants were forced to have Chau authenticate various signatures and signature stamps, including Daniel's, on different documents introduced at trial. Other than mistakenly believing he had lost his signature stamp, Daniel provides no grounds for failing to stipulate to the authenticity of these documents. And from the portions of the record cited by the parties, it does not appear there were any serious doubts about the authenticity of any of the documents with signature stamps.

Daniel also admits to questioning the accuracy of several translated documents, which necessitated an appearance by the translator at trial. The record also shows several instances in which Daniel objected to the authentication of translated documents on grounds the translator needed to be made "available for cross-examination as to the accuracy of their translation." But the record reflects the parties stipulated to the translator. Nor does Daniel explain why any disputed translation could not have been resolved prior to its presentation at trial, avoiding the need for the translator to testify. While Daniel generally contends that objecting to a translation is a proper litigation tactic, he does not explain why objection to the authenticity of these translations was warranted or why it was necessary to examine the translator, especially where he "later stipulated to the introduction of the contested documents." Further, we must presume the record contains sufficient evidence to support the court's finding that Daniel's challenges to these translations unnecessarily prolonged trial. (*Universal Home Improvement, Inc. v. Robertson* (2020) 51 Cal.App.5th 116, 125-126.) Consequently, Daniel has failed to show there is insufficient evidence to support this finding.

As to the court's second example, Daniel suggests his consideration argument was legally tenable based on "his belief of the underlying facts, as they occurred." But the court was not troubled by the legal portion of his argument. Rather, it found the argument factually untenable based on its determination that Daniel's testimony was "mis-leading, not credible and even false." In response, Daniel spends a

16

large portion of his brief arguing the court erred by finding his testimony lacked credibility while believing the testimony of Chau. But he overlooks a key aspect of appellate review. Appellate courts do not determine the facts themselves. (*People v. Brown* (2014) 59 Cal.4th 86, 105-106.) An appellate court "'ha[s] no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.'" (*Leff v. Gunter* (1983) 33 Cal.3d 508, 518.) "'Resolution of conflicts and inconsistencies in the testimony is the *exclusive province* of the trier of fact.'" (*Brown*, at pp. 105-106, italics added.) "'"The trial judge, having heard the evidence, observed the witnesses, their demeanor, attitude, candor or lack of candor, is best qualified to pass upon and determine the factual issues presented by their testimony."'" (*Catherine D. v. Dennis B.* (1990) 220 Cal.App.3d 922, 931.)

As to the court's third example, Daniel does not offer anything to show this finding is unsupported by substantial evidence, and, therefore, we presume it is supported by the record. (*Universal Home Improvement, Inc. v. Robertson*, *supra*, 51 Cal.App.5th at pp. 125-126; see *Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409 (*Huong Que*).)

Daniel's opening brief spends little time addressing any of the court's factual findings discussed above supporting its conclusion that he overlitigated this case. Instead, he argues it was not his fault the trial lasted seven days instead of three. He asserts it was claimants that engaged in excessive litigation. Specifically, he maintains claimants introduced a variety of tangential documents that were irrelevant to determining whether the Handwritten Agreement or the Compromise Agreement was enforceable. These documents include, among others, the Cancellation of Trust, the Chau/Melissa Sale Agreement, the Sun Ten Sale Agreement, Daniel's resignation from the Foundation, and documents relating to the transfer of Daniel's shares back to Brion

17

Corporation. Daniel claims he tried to streamline the trial by objecting to the introduction of these documents.

This argument is outside our scope of review. When reviewing for substantial evidence, "'the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the [trial court's] determination . . . . *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*'" (*Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138, 143.) It is irrelevant whether the trial court could have found that claimants were responsible for unnecessarily prolonging trial. Instead, we review whether substantial evidence supports the court's finding that Daniel engaged in excessive litigation.

Besides, we find no merit to Daniel's contention that these documents were irrelevant to the issues at trial. The documents were all executed after the March 1, 2006 meeting, and, significantly, they all relate to various points discussed at that meeting: the return of Daniel's Brion Corporation shares, his lack of further involvement with the Foundation and Brion Corporation, and the $4 million promised. As such, they provide evidence that the Handwritten Agreement was not intended to be a binding, final contract between Daniel and his siblings. Rather, it can be inferred from these documents that the Handwritten Agreement was only a memorandum of general points that the parties understood would be followed by formal contracts, namely, these documents. Consequently, Daniel's suggestion that these documents were irrelevant at trial is unpersuasive.

In summary, the court's findings relating to Daniel's overlitigation of this case are supported by substantial evidence, so it was not arbitrary or capricious for the court to deny his request for $50,000 in fees incurred at trial.

18

*C. Appellate Attorney Fees*

 Litigants to a spousal dissolution may request appellate attorney fees under section 2030.  (*In re Marriage of Macfarlane & Lang* (1992) 8 Cal.App.4th 247, 258.)[6] "To warrant an award of fees on appeal, four conditions must be met:  (1) the requesting spouse must show a need for the award; (2) the paying spouse must have the ability to pay the fees; (3) the appeal must be taken in good faith; and (4) there must be reasonable grounds for the appeal in the sense that reasonable persons should believe that the contentions merit the appellate court's attention and resolution."  (*Ibid*.)  As with other fees requested under section 2030, a court's denial of appellate fees is reviewed for an abuse of discretion.  (*Hunter v. Hunter* (1962) 202 Cal.App.2d 84, 92.)

 In the attorney fees ruling, the court denied Daniel's request for $30,000 in appellate fees because he failed to show reasonable grounds for appeal.  It explained that "the contents of the Handwritten Agreement . . . fell a mile short of being understandable so to be enforceable.  Nor was the Handwritten Agreement . . . intended by the parties as the final agreement (per the credible testimony from Chau, conflicting with the incredible testimony from Daniel) . . ., as evidenced by the parties participating in the subsequent drafting and execution of the Compromise Agreement . . ., followed by a plethora of subsequent agreements intended to execute and fulfill the negotiated expectations and promises of the parties, all the while Daniel [accepted] the negotiated benefits and . . . . did so over many years until the negotiated benefits timed out.  In the end the court did not struggle during deliberations . . . ."

 Daniel fails to show any error in the court's analysis.  Instead, he contends that in his future appeal he will show the Handwritten Agreement contains all the

---

[6] *In re Marriage of Macfarlane & Lang*, *supra*, 8 Cal.App.4th at page 258, applied former Civil Code section 4370, which was the predecessor to section 2030 (*In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1048-1049; see Stats. 1993, ch. 219, § 106.1).

elements of a valid contract. He then cites evidence showing (1) the Handwritten Agreement recorded four general points, (2) the parties all testified to the meaning of those four points, (3) the Handwritten Agreement was signed by all three siblings and Shen, (4) the parties all understood the Handwritten Agreement recorded Daniel's agreement to be bought out of the Brion Corporation and the Foundation for $4 million and an annual salary of $100,000 until May 2011.

Daniel, however, completely ignores the evidence supporting the trial court's findings, particularly, the evidence showing the Handwritten Agreement was not intended to be a binding contract. By doing so, he has failed to meet his of burden of showing the court's ruling was unsupported by substantial evidence. (*Huong Que*, *supra*, 150 Cal.App.4th at p. 409.) While it is not our burden to locate this evidence, we have done so to highlight Daniel's failure to show that he can reasonably prevail in any future appeal.

Among other things, Chau testified that he told Daniel on March 1, 2006 that a formal agreement would be prepared. Likewise, Shen testified it was his "understanding that a formal agreement was to be prepared following the March 1st, 2006, meeting[.]" He recounted that at the March 1, 2006 meeting, "each of us agreed that [the Handwritten Agreement] was a memo and the [formal] agreement should be drafted." Melissa also testified the Handwritten Agreement was a "memorandum" rather than a final agreement. She stated all three siblings understood the Handwritten Agreement would be followed by an official agreement drafted in English by an attorney. She further explained the Handwritten Agreement did not contain all the agreed upon points from the March 1, 2006 meeting. Finally, though the Compromise Agreement was signed in September 2006, it was "effective as of March 1, 2006." This further indicates it was meant to formally record the three siblings' agreement at the March 1, 2006 meeting, and the Handwritten Agreement was not.

20

Moreover, Daniel sent a fax to Sun Ten's legal counsel on June 14, 2006, a few months before he signed the Compromise Agreement. In this fax, which was translated from Chinese to English, Daniel requested changes to the salary he negotiated at the March 1, 2006 meeting. Specifically, he states, "[t]he final conclusion is that the agreement reached at the beginning of March will remain the same. The only change was about my salary for the next 5 years." He then explained how he would like his salary to be paid over the next five years. Within the same fax, he further states that "with regard to the agreement, you mentioned that you would get it ready by mid-July. Could you please tell the attorney to hurry a little? [B]ecause I probably would not be here for the entire month of July. I will be going to Canada. Please make sure to ask the attorney to help out. Even if it would be just an initial draft. [I]t would be ok." From this fax, it can be inferred that Daniel knew the Handwritten Agreement was not final and was waiting to receive the final agreement as of June 2006. This interpretation is bolstered by the plethora of documents discussed above that Daniel signed months after the March 1, 2006 meeting, which all related to the subject matter discussed at that meeting.

Daniel's failure to mention this evidence is telling. The testimony of Chau, Melissa, and Shen shows Daniel knew the Handwritten Agreement was not intended to be a final agreement. Their testimony is supported by Daniel's fax, in which he continues to negotiate his salary and requests to be provided with a draft of the final agreement. And it is reinforced by the numerous documents Daniel signed after the March 1, 2006 meeting. Daniel fails to cite anything in the record showing he ever questioned these documents or the benefits he received from them. At Daniel's prospective appeal, this evidence would all be accepted as true, and all reasonable inferences from this evidence would be made in support of the trial court's ruling. (*In re Michael G.*, *supra*, 203 Cal.App.4th at p. 589.) Daniel provides no explanation as to how he can overcome this extensive evidence and establish the Handwritten Agreement was a valid contract.

21

*D. The Indemnity Ruling*

As to the indemnity ruling, it only provides an alternative ground for denying the spouses' request for additional attorney fees under section 2030. Although issued in separate documents, both the indemnity and attorney fees rulings appear to comprise a single order denying the requested fees on alternative grounds. Among other things, the indemnity ruling, which was entered on February 13, 2020, expressly incorporates by reference the attorney fees ruling, which was entered on February 10, 2020. Further, although the indemnity ruling was entered on February 13, 2020, Daniel's notice of appeal only states he is appealing the order entered on February 10, 2020. This provides further support for our conclusion that the two rulings comprise a single order.[7] Finally, even if we found error in the indemnity ruling, it would have no effect on the outcome of this appeal. The court's denial of attorney fees would still stand based on our analysis of the attorney fees ruling.

Since we find no error in the attorney fees ruling, we need not address the propriety of the indemnity ruling. Should the trial court issue any other orders on the indemnity issue outside the context of this attorney fees dispute, our opinion does not preclude any party from appealing them.

---

[7] To the extent the indemnity and attorney fees ruling are separate orders, we arguably lack jurisdiction to review the indemnity ruling since it was not identified in Daniel's notice of appeal. (See *DeZerega v. Meggs* (2000) 83 Cal.App.4th 28, 43 ["'[W]here several judgments and/or orders occurring close in time are separately appealable . . ., each appealable judgment and order must be expressly specified—in either a single notice of appeal or multiple notices of appeal—in order to be reviewable on appeal'"].)

22

### III

### DISPOSITION

The court's postjudgment order denying Daniel attorney fees is affirmed. Claimants are entitled to their costs on appeal.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ZELON, J.*


*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of CHRISTINE NAKAMOTO and DANIEL HSU. | |
| CHRISTINE NAKAMOTO, | G059108 |
| Respondent, | (Super. Ct. No. 11D006853) |
| v. | ORDER GRANTING REQUEST FOR PUBLICATION |
| DANIEL HSU, | |
| Appellant; | |
| BRION CORPORATION et al., | |
| Claimants and Respondents. | |

Christopher C. Melcher from the law firm Walzer Melcher & Yoda LLP, a nonparty in this case, has requested that our opinion, filed on May 4, 2022, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

The opinion is ordered published in the Official Reports.


MOORE, J.

I CONCUR:


BEDSWORTH, ACTING P. J.